Donald J. JAMISON, Sr., et al., Plaintiffs and Respondents,

v.

UTAH HOME FIRE INSURANCE COMPANY, Defendant and Appellant.

No. 14523.

Supreme Court of Utah.

Jan. 20, 1977.

L. L. Summerhays, of Strong & Hanni, Salt Lake City, for defendant-appellant.

Gaylen S. Young, Jr., Salt Lake City, for plaintiffs-respondents.

CROCKETT, Justice:

The issue involved herein is plaintiffs' asserted right to recover from the defendant insurance company $12 per day for loss of household services of their 12-year-old

son as coming within the meaning of Section 31–41–6(1)(b)(ii), U.C.A.1953, which is quoted below. From a determination on that issue in favor of the plaintiffs, awarding disability benefits at $12 a day for 112 days, totaling $1,344, and attorney fees totaling $475 and costs, the defendant appeals.

Inasmuch as the recovery sought is based on the No-Fault Insurance Act, the exact details as to how the accident occurred are not material to the issue involved. There is no dispute about the fact that while Donald was riding his bicycle on Highland Drive about 3700 South in Salt Lake County on November 19, 1974, he was involved in a collision with a pickup truck driven by Boyd D. Lemon, who was insured by the defendant, nor that Donald suffered bruises and contusions, injuries to his hip and a broken nose. He was hospitalized for a week, then remained at home until after the Christmas holidays when he was permitted to attend school, but was not given an outright release by his doctor until March 11, 1975. This totals the 112 days during which plaintiff says he was not able to perform the household services hereinafter listed.

The parties reached an agreement and the court approved a settlement as to other aspects of the case for Donald's injury, medical and hospital expenses. But, they were unable to agree upon, and therefore stipulated to reserve for determination by the court, the issue as to plaintiff's rights to any further damages as disability benefits under the No-Fault Insurance Act, and as to attorney's fees.

The statute of concern here, Section 31–41–6(1)(b)(ii), states:

. . . in lieu of reimbursement for expenses which *would have been reasonably incurred* for services that, but for the injury, the injured person would have performed for *his household* and regardless of whether any of these expenses are actually incurred, an allowance of $12 per day commencing not later than three days after the date of the injury and continuing for a maximum of 365 days thereafter, . . . . [Emphasis added.]

The view of this statute advocated by the plaintiff is that it mandates an automatic award of $12 per day for injury to any member of a household who would have performed services of any nature, however much or minimal, and whether their value is great or small. As it is but natural to expect, the defendant takes a differing view and argues that the statute is not susceptible to any such interpretation. We have no hesitancy in agreeing that the interpretation and application of the law should be a process of reason, as contrasted to a mere reading of tables or schedules, nor that when controversies arise it is both permissible and desirable to look to the background and purpose of a statute to ascertain its meaning and proper application in particular circumstances.

Since the advent of the automobile near the turn of this century there has been a constant and accelerating increase, both in the number of automobiles and the speed at which they travel, and a corresponding increase in injuries and damages resulting from their use. This has resulted in ever increasing insurance coverage and insurance costs, including various methods of compelling insurance coverage. Consequent to this, due to the controversies and litigation over who was at fault in such accidents, with the attendant delays, uncertainties and expenses, the concept of No-Fault Insurance arose. In enacting it, our legislature determined as a matter of public policy that some specified primary damages as to necessary medical, hospital, and loss of wages should be paid without undue delay.[1]

This objective is plainly stated in Sec. 31–41–2:

. . . to effectuate a more efficient, equitable method of handling the greater bulk of the personal injury claims that arise out of automobile accidents . . .

---

1. The No-Fault Insurance Act was enacted in 1973 as Chap. 55 S.L.U.1973, is now in our Code as Sec. 31–41–1, et seq.

Another equally important and desirable objective of the act, to be achieved in correlation with the foregoing, is coping with the ever increasing costs of the insurance. This is also clearly expressed in the language of the same section, stating that a purpose of the act is to possibly *stabilize,* if *not effectuate certain savings* in the rising costs of automobile accident insurance.

Consistent with the general purposes just stated, Sec. 31–41–7 provides a formula to arrive at what the actual losses are; and also provides that any benefits shall be reduced by other coverages, workmen's compensation or military benefits, which the injured person receives. This idea finds further support in Section 31–41–8, which states that payment of the benefits provided for in Section 31–41–6 shall be made on a monthly basis *as expenses are incurred* ; and that benefits are overdue if not paid within 35 days after the insurer receives "reasonable *proof of the fact* and amount of *expenses incurred.*"

To test the validity of plaintiff's contentions and how they coordinate with the above stated objectives and provisions of the statutes, such problems as this should be considered: assume, e. g., a family where there are eight or ten children, each of whom does his assigned share of the family chores. The family car has a collision and all are injured. Does the insurer pay the $12 per day $\times$ 10 = $120 per day? Or, does the rule of reason apply?

However much we may desire it to be otherwise, this fact might as well be accepted as inescapable: that insurance is a business, not a philanthropy. There can be no free gifts or benefactions. In the long run premiums must pay for losses; and therefore, increases in premiums must and will be correlated to the extent of the coverage.

Otherwise, the business cannot continue to operate. Someone has to pay the increased premiums. That someone is the policyholders, i. e., the public. Accordingly, a seeming generosity in broadening coverage in an individual situation, would be no favor to policyholders generally, nor to the public.

The principle which best serves the objective to be desired is to give both parties the benefit of a sensible, even-handed and practical application of the statute, under the assumption that all of its language was used advisedly and in harmony with its purposes.[2] If the Act had intended reimbursement for any and all duties performed by members of households, it could have plainly so stated. But it does not do so. Only by keeping the awards within reason, and excepting therefrom claims that might be unrealistic, fanciful, or perhaps even fraudulent,[3] can the stated objective, "to effectuate . . . *savings in the rising costs* of automobile accident insurance . . . ." be accomplished. Otherwise it is obvious that necessary increases in premiums would defeat, rather than promote, the purposes of the Act.

■ When the provisions of the sections of the Act as quoted herein are considered together in the light of that purpose, particularly the key statement in Section 31–41–6, wherein it speaks in terms of reimbursement "for expenses *which would have been reasonably incurred*" it becomes plain that the Act, both in its statement of general purpose, and its specific provisions, was not intended to provide an automatic reward or a "windfall," for being involved in an accident by requiring payment when there was no loss actually suffered, nor for any expense not reasonably to be incurred,[4] but should be construed in conformity with the

**2.** *Farmers Insurance Co. v. U.S.F. & G. Co.,* 13 Wash.App. 836, 537 P.2d 839 (1975); *Oregon Automobile Insurance Co. v. Salzberg,* 85 Wash.2d 372, 535 P.2d 816 (1975).

**3.** No bad faith is imputed in this case.

**4.** *Cumis, Inc. Society v. Republic Nat. Bank,* 480 S.W.2d 762 (Tex.Civ.App.1972); *Anderson v. Group Hospitalization, Inc.,* 203 A.2d 421 (D.C.Ct.App.1964); *Barmeier v. Oregon Physicians Service,* 194 Or. 659, 243 P.2d 1053 (Ore. 1952); *Fire Assn. of Philadelphia v. Strayhorn,* 211 S.W. 447 (Texas 1919); *Whitney Estate Co. v. Northern Assur. Co.,* 155 Cal. 521, 101 P. 911 (Cal.1909).

fundamental principle of insurance law, that the purpose of insurance is to indemnify for losses or damages suffered, as contrasted to gambling for a munificent reward if a loss occurs.[5]

The clause of the statute, "and regardless of whether any of these expenses are actually incurred   .   .   .," was undoubtedly included to eliminate the necessity of proof and to prevent an insurance company from claiming the benefit of services rendered gratuitously by friends or relatives,[6] which otherwise would have to be paid for. But it is still speaking of "expenses which would have been reasonably incurred."

It seems commendable indeed that Donald assumed and discharged considerable responsibility in the household. Particularly in view of the fact that he had two older sisters, one 13 and one 14, and his parents, all of whom were able to help. Donald's contributions are summarized, with the time for each, thus:

Took out the garbage daily (five minutes); washed dishes two or three times a week (fifteen to twenty minutes); vacuumed carpet three or four times a week (fifteen to twenty minutes); helped mother carry in groceries from car each Friday (no time given); and washed the car in the summer once every week or two (no time given).

In response to a question as to whether the sisters and others helped with those chores Mrs. Jamison testified:

Q.   And they shared the household duties around the house, did they with your son?

A.   A little. My oldest one worked, and my other one was mainly out tending. She brought in extra money by going out tending.

Q.   You say they didn't do the dishes along with your son?

A.   A little, yes. They helped around the house, but Don did most of the chores around the house because the girls were not home that much.

Q.   Did the manager of the apartment have your walks cleaned for you?

A.   I will say, sometimes.

Q.   Did you ever complain to him about not doing it?

A.   Oh, definitely. That's why we moved out. We had a lot of complaints with him.

Whatever view may be taken of the foregoing, for the purpose of dealing with the issue presented in this case, we accept the validity of the plaintiff's averment that, "but for the injury, the insured (Donald) would have performed his household duties as recited herein." But, in accordance with our understanding of the statute as hereinabove discussed, there remains the other critical question: Is it reasonable to suppose that the plaintiff's family would have hired someone else and paid out money to do the chores he lists.[7]

 In this connection, it is also pertinent to observe that the general rule is that an award of damages cannot properly be made on mere possibility or conjecture, there must be a firmer foundation. That is, any such award must be supported by proof upon which reasonable minds acting fairly thereon could believe that it is more proba-

---

5.   U.C.A., Sec. 31–1–7 defines insurance as "a contract whereby one undertakes to indemnify another or pay or allow a specified or ascertainable amount or benefit upon determinable risk contingencies."

6.   See *Robinson v. Hreinson*, 17 Utah 2d 261, 409 P.2d 121 (1965).

7.   The dissent poses questions which are quite different from and therefore not involved here. But in the interest of avoiding misunderstand-
ing, we respond: It would seem that in both examples there would be reimbursement. In the first because they are the type of services for which the family would *reasonably* incur expenses; and the second because there would be actual expenditures for that type of service. Whereas here, we have concluded that the minor tasks done by Donald were not things for which the family would have "reasonably incurred" expenses by hiring someone else to perform.

ble than not, that damage was actually suffered.[8]

■ Upon our consideration of the problem in the light of what has been said herein, it is our opinion that reasonable minds would not believe that the chores done by Donald were something for which the family would "reasonably have incurred" expenses, i. e., would have hired someone else to do them and thus have made a cash outlay. That being so, reimbursement for such services is not covered by the statute.

■ Concerning the award of $475 to the plaintiffs as attorney's fees,[9] the problem is quite different and the record is somewhat confused. This is undoubtedly due to the fact that concern was focused upon the main problem in the case, which we have discussed above. There is concededly some indication that the matter of attorney's fees was tied to that problem. But, there are also indications otherwise. In his summation the trial court included the following:

The insurance company knew then what the nature of the claim was and *declined to make any payment within 35 days thereafter.* And I suppose the counterargument is we were in litigation. But I suppose the answer to that is we were in litigation when medical expenses were paid, and that took those out of this present action.

So the court finds that the reasonable sufficient proof of claim was given at one or the other of those dates, and that the *amounts which the Court has heretofore adjudged to be due as benefits under the Act were not paid within 35 days.* The Court finds, therefore, that a reasonable attorney's fee is provided for under the Act under this circumstance, and further *finds that the sum of $475 is a reasonable attorney's fee* under all the circumstances. This is not taking into account there

were other claims in this lawsuit, and *it is really difficult to separate out time;* and looking at what generally, *reasonably would have been required to pursue just this claim,* I find that $475 would be a reasonable attorney's fee for that amount.

The exhibit showing the details and time of other payments made by the defendant insurance company was not included in the record brought here. In order to overturn the judgment, it is the appellant's burden to affirmatively show that the trial court was in error. In the absence of that record, and because there is evidence as to the reasonableness of the attorney's fee, that portion of the judgment should remain undisturbed. But the award of $12 per day benefit is reversed. The parties to bear their own costs. (All emphasis in this opinion is added.)

HENRIOD, C. J., and WILKINS, J., concur.

NOTE: The majority of the court had acted in this case prior to the retirement of Chief Justice HENRIOD. Its release was delayed pending preparation of the dissent.

MAUGHAN, Justice (Dissenting).

We should affirm the trial court. All references are to U.C.A.1953, as enacted L.1973.

The majority opinion is premised on the assumption that 31–41–6(1)(b)(ii) is ambiguous and that it is essential to apply the rules of construction to determine the underlying legislative intention in order to construe its provisions.

The language of the section is clear, precise, specific and unambiguous and it is the duty of this court to interpret as the legislature has expressed it.

8. As to the degree of certainty required to prove loss or damage incurred, see *Robinson v. Hreinson,* footnote 5 above.

9. Section 31–41–8 provides that benefits under the Act are overdue if not paid within 35 days after the insurer receives notice and proof and

that in an action to recover those expenses, the insurer is required to pay reasonable attorney's fees.

(ii) in lieu of reimbursement for expenses which would have been reasonably incurred for services that, but for the injury, the injured person would have performed for his household and *regardless of whether any of these expenses are actually incurred*, an allowance of $12 per day . . . .

The clear meaning of this statute is that if the injured person would have performed household services, but for the injury, he is granted a flat allowance. The injured party in the instant case, washed dishes, took out garbage, vacuumed carpets, assisted his mother in carrying groceries, and washed the car. The statute provides an allowance for this labor, whether any expense was actually incurred. The flat rate avoids the necessity of proving the reasonable value of each service performed. The effect of the majority opinion is to engraft a valuation requirement in contradiction of the express terms of the statute, viz., whether the value of the services is sufficient to merit the employment of another to perform them. Through judicial legerdemain the majority opinion has amended the statute to conform with the Massachusetts Act, Mass.Genrl. Laws, Chapt. 90, Sec. 34A, Amended by St.1970, C. 670, Sec. 1, which provides:

. . . and for payments *in fact made* to others, not members of the injured person's household and reasonably incurred in obtaining from those others ordinary and necessary services in lieu of those that, had he not been injured, the injured person would have performed not for income but for the benefit of himself and/or members of his household . . . . [Emphasis supplied.]

Since Utah Act, Chapt. 41, Title 31, was basically patterned after the Massachusetts Act, the determination of the legislature to depart from the benefit provisions has great significance. The majority has it, to be entitled to the statutory benefits, the injured party must prove actual damages, viz.; he must prove the household services were of such a value to his family, that through interruption of the performance, the family is compelled to hire someone else, and make a cash outlay.

The phrase "regardless of whether any of these expenses are actually incurred" has been restricted to those instances where the injured person fortuitously locates a good Samaritan, who administers to his brother's needs gratuitously. If a member of the household performs the injured party's household duty, no benefit need be paid is the underlying philosophy of the majority, which, in fact, coincides with the Massachusetts statute. In that statute the services must be rendered by one who is not a member of the injured party's household.

How would the majority apply its ruling to the following fact situation: The mother of five young children is injured. Her husband takes his annual vacation and performs the mother's regular household duties. As father and husband, he is equally responsible for the care of his family. Should the mother recover the statutory allowance? What if the family has three healthy teen-age daughters, who suffer from a terminal case of laziness? The mother is injured, and the family employs someone to clean the house and cook the meals. Should the statutory allowance be denied because the daughters *should have* performed these household services?

The legislative design of the statute was to eliminate any valuation proof, e. g., were the household services of minimal or great value, and to set a flat rate. The sole issue under this statute is whether the party would have performed household services, but for the injury. If he would have, he is entitled to the statutory benefit.

The selective citations of the Act to buttress the peculiar construction of the majority merits attention.

31–41–2, provides:

The *purpose of this act is to require the payment of certain prescribed benefits* in respect to motor vehicle accidents through either insurance or other approved security but on the basis of no fault, preserving, however, the right of an injured person to pursue the customary tort claims where the most serious

type of injuries occur. *The intention of the legislature* is hereby to possibly stabilize, if not effectuate certain savings in, the rising costs of automobile accident insurance and *to effectuate a more efficient method of handling* the greater bulk of the personal injury claims that arise out of automobile accidents, these being those not involving great amounts of damages. This act is not designed to have any effect on property damage claims.

The majority opinion states the public policy set forth is to provide the payment for some specified, primary damages without undue delay. I construe this section as declaring that in certain accidents where personal injury claims do not involve great amounts of damages, the injured party is deprived of his common law tort action. In substitution thereof certain prescribed benefits will be paid. The Act further states the intention of the legislature to stabilize, if not effectuate certain savings in, the cost of automobile insurance. The flat rate of $12 per day in Section 6(1)(b)(ii), in substitution of value, is a specific application of this policy.

The majority further cites Sec. 8 of the Act, wherein it is provided in regard to the various benefits set forth in Sec. 6, that they shall be paid on a monthly basis as *expenses are incurred* and that benefits are overdue if not paid within 35 days after the insurer receives "reasonable *proof of the fact* and amount of *expenses incurred.*"

Since these are general provisions in direct conflict with the specific provision of Sec. 6(1)(b)(ii) providing *"regardless of whether any of these expenses are actually incurred,"* the majority's interpretation is perplexing.

The majority expresses the view that to grant the benefit in the instant case would be a windfall and against public policy, by broadening coverage, to the detriment of the public through increased insurance costs. Basic policy is a legislative determination. The selection of a flat rate in place of an individual valuation is a matter specifically within the province of the legislature; it alone may determine the coverage, viz., the payment of certain prescribed benefits in lieu of the common law tort action.

The application of insurance law in this matter is inappropriate. This is not an insurance act, per se, but a scheme analogous to the Workmen's Compensation Act, wherein the legislature has determined that common law actions and principles are inadequate to deal with the social problem. In response to social conditions, the legislature has created an entirely new basis to compensate injured persons; the Act should be so interpreted without reliance on the concepts of traditional tort law.

ELLETT, J., concurs in the views expressed in the dissenting opinion of MAUGHAN, J.